Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| T.S., and J.S.,<br><br>        Plaintiffs,<br><br>vs.<br><br>ANTHEM BLUE CROSS BLUE SHIELD, and the DELOITTE LLP GROUP INSURANCE PLAN.<br><br>        Defendants. | COMPLAINT<br><br>Case No. 2:22-cv-00202-DAK |

Plaintiffs T.S. and J.S., through their undersigned counsel, complain and allege against Defendants Anthem Blue Cross Blue Shield ("Anthem") and the Deloitte LLP Group Insurance Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. T.S. and J.S. are natural persons residing in Haywood County, North Carolina. T.S. is J.S.'s mother.

1

2. Anthem is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). T.S. was a participant in the Plan and J.S. was a beneficiary of the Plan at all relevant times. T.S. and J.S. continue to be participants and beneficiaries of the Plan.

4. J.S. received medical care and treatment at Solstice East ("Solstice") beginning on March 25, 2019. Solstice is a residential treatment facility located in North Carolina, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Anthem denied claims for payment of J.S.'s medical expenses in connection with her treatment at Solstice.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah and across the United States, and Deloitte has an office in Salt Lake City.

8. In addition, T.S. has been informed and reasonably believes that litigating the case outside Utah will likely lead to substantially increased litigation costs for which she will be responsible to pay and which would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the

Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### J.S.'s Developmental History and Medical Background

10. From a very early age J.S. struggled with anxiety and depression and exhibited behavioral problems. She was especially sensitive to stimuli related to textures, sounds, and environments and was diagnosed with a sensory integration disorder. J.S. had frequent rage filled tantrums and began meeting with a therapist.

11. J.S. was placed in the gifted program but struggled in school due to behavioral problems and perfectionistic tendencies. She would erase her work so many times trying to get it just perfect that she often tore holes in the paper. Her anxiety became so severe that she would often have to run out of the room during movies, and at school she would have to wear noise cancelling headphones and sit in the corner when she became overwhelmed.

12. J.S. was aggressive and would break things at home and would threaten her parents and little sister. J.S. started meeting with a psychologist and receiving additional outpatient therapy which, while helpful, still often left her paralyzed with anxiety.

13. In 2009, J.S. moved to a different state. She always had difficulty making friends and this complicated things even further. J.S. began receiving treatment in an outpatient program called Brain Balance three times a week. J.S. was extremely sensitive to changes in diet and routine and even minor changes could set her off. For instance, when she was given antibiotics following a strep throat diagnosis she became extremely dysregulated and threatened to kill her family and herself.

14. J.S. moved back to Georgia and continued going to therapy. She received a psychoeducational evaluation and was given additional school accommodations. J.S. also suffered from other problems such as frequent migraines (sometimes lasting as long as a month and requiring urgent care visits), back pain, and trouble sleeping. One month-long migraine was so severe that it required three separate emergency room visits including a visit with 24 hour observation.

15. J.S. continued to meet with various therapists, psychiatrists, and neurologists, and had her medications frequently adjusted but she continued to suffer from severe physical and mental health symptoms which greatly impeded her ability to function normally. J.S. became increasingly depressed and on March 12, 2019, she gave her parents a letter which expressed suicidal ideation and stated, "I don't see a point in trying anymore."

16. T.S. became increasingly concerned for J.S.'s welfare and contacted J.S.'s psychologist and psychiatrist for help. These providers recommended that T.S. be immediately placed into a long-term treatment program like the one at Solstice.

//

//

//

**Solstice**

17. J.S. was admitted to Solstice on March 25, 2019. This treatment was denied by Anthem. T.S. appealed the denial through a submission on her online member portal, but the denial was upheld by Anthem.

18. In a letter dated March 4, 2019[1], Anthem again denied payment for J.S.'s treatment. The letter, attributed to an unidentified medical director, gave the following justification for the denial:

> We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to have residential treatment center care. The reason we were given for this was that you were at risk for serious harm without 24 hour care. We understand that you would like us to change our first decision. Now we have new information from the medical record. We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason. You were not at risk for serious harm that you needed 24 hour care. You could have been treated with outpatient services. We based this decision on this health plan guideline. (Psychiatric Disorder Treatment – Residential Treatment Center (RTC) (CG-BEH-03).
>
> The services are considered not medically necessary as defined in the Definitions section of your Deloitte LLP summary plan description on page 115.

19. On July 23, 2019, T.S. requested that the denial of payment for J.S.'s treatment be evaluated by an external review agency. She stated that she had attempted to procure a copy of the psychiatric disorder treatment guidelines mentioned by Anthem, but they were not available on its website. T.S. stated that she then requested these materials directly from Anthem but was instead provided with Anthem's criteria for Persistent Depressive Disorder.

---

[1] March 4, 2019, is about three weeks prior to J.S.'s admission. When T.S. asked Anthem about the discrepancy, Anthem sent the Plaintiffs a corrected letter dated April 4, 2019, which is essentially identical to the March 4, 2019, letter only it changes the date the request was received.

20. T.S. wrote that she was told by the Anthem reviewer that these were the criteria used to evaluate J.S.'s treatment and the reference to Anthem's Psychiatric Disorder Treatment criteria was made in error. T.S. stated that she was not convinced this was true based on the comments of an Anthem representative alone, but if it were true it was problematic because depression was only one component of the reason J.S. was admitted to Solstice.

21. T.S. noted that Anthem's denial was dated March 4, 2019, even though J.S. was not even admitted to Solstice until March 25, 2019. She stated that she then contacted Anthem on May 28, 2019, and informed it that it had clearly made a mistake by denying payment for services weeks before J.S. had begun to receive them. The Anthem representative stated they would investigate the issue and would provide her with a corrected letter.

22. T.S. stated that she had received a corrected denial letter, but apart from changing the date, having no attached clinical guidelines, and the presence of a short statement clarifying that it was a corrected letter, it was essentially a carbon copy of the initial letter.

23. T.S. wrote that Anthem's failure to get such basic details right in its letter left her little confidence that Anthem had satisfied its obligations under ERISA during the review process.

24. She mentioned that she had submitted a letter to Anthem requesting a copy of all utilization review notes, physician's opinions, patient event notes, and any other materials pertinent to the case, but she had not received these materials. T.S. again requested to be provided with these materials and stated that they were essential for her to assess the Plan's MHPAEA compliance.

25. T.S. took issue with the reviewer's assertion that J.S. was not "at risk for serious harm." She stated that this was an acute level requirement and was not appropriate to assess the medical necessity of the subacute residential treatment J.S. received nor was it congruent with generally accepted standards of medical practice. She quoted Anthem's criteria for acute hospitalization, as well as its criteria for residential treatment and noted that the requirements for each were strikingly similar, despite the fact that residential treatment facilities were neither equipped nor intended to handle the same types of patients receiving inpatient hospitalization services.

26. T.S. pointed out that Anthem's criteria for residential treatment required both that a member experience "self injurious or risk taking behaviors that risk serious harm" and also that a "short term, subacute residential treatment service will have a likely benefit on the behaviors/symptoms that required this level of care, and that the member will be able to return to outpatient treatment."

27. T.S. included a letter from board certified child and adolescent psychiatrist Dr. Michael Connolly with the appeal. This letter stated in part:

> Residential treatment always involves subacute inpatient treatment on a 24-hour/ 7 day a week basis. If a patient is acute life threatening or threat to themselves or others, or if they are psychotic, they cannot be cared for in a residential treatment setting without violating well-recognized standards for proper care of substance use disorders and mental health issues. Treatment in an acute inpatient setting is the proper level of care for these patients until they are no longer a threat to themselves or others. Often, a better conceptualization of that patient is to view them as a chronic risk, in which care outside of a 24/7 facility would likely lead to regression and further acute life threatening events…
>
> When adolescent patients are not an acute threat to themselves or others and not psychotic, residential treatment is often the most medically necessary, cost efficient, and proper level of care. Residential treatment is prescribed when a patient's treatment team believes the patient will need a longer period in a subacute inpatient setting to internalize and incorporate into their thinking and

behavior appropriate methods, techniques, and strategies to deal with their mental health or substance use disorders.

28. T.S. contended that Anthem' requirements of acute dangerousness and its attempts to limit treatment to short-term care was far outside of the norms of generally accepted standards of medical practice. She included an excerpt from a psychiatry textbook which also showed that residential treatment was meant for subacute care, as well as an article from the American Academy of Child and Adolescent Psychiatry. She also noted that Anthem's criteria were advisory only and were not intended to supplant sound medical judgment.

29. T.S. wrote that J.S.'s treatment was medically necessary and was a covered benefit under the Plan. She stated that J.S. was admitted to Solstice on the recommendation of her psychiatrist and psychologist and after years of unsuccessful interventions at the outpatient level.

30. She included a joint letter of medical necessity with the appeal. In a letter dated May 30, 2019, Holly Middleton, PhD., ABPP, and Eva Nemeth, M.D. wrote in part:

> By the time school started in the fall of 2018, she was so depressed that she cried herself to sleep nightly, felt suicidal, was concerned about the potential suicide of others, and was giving up on every aspect of her life. She wrote a long letter to her mother indicating her desire to die and the extreme pain caused by her depression. At the time, it was clear that even an intensive outpatient program was not going to be enough for [J.S.] because she had tried consistent therapy and could not keep herself from feeling like she wanted to act on her thoughts of suicide. Her dark thoughts were now stretching from the evening when she was alone in bed to throughout the day. Despite the building of coping strategies, contract work, and behavioral interventions designed to reduce suicidal thought, [J.S.] could not commit to keeping herself safe. She needed residential care immediately. She needed the benefit of round the clock services in order to guarantee her safety and a specialized environment that could monitor the effects of medication and include intensive group and behavioral interventions. We strongly recommend residential treatment for [J.S.] at this time.

31. T.S. also attached copies of J.S.'s medical records with the appeal. These records showed that she continued to struggle with chronic migraines, depression, hopelessness, lack of motivation, suicidal ideation, and nightmares.

32. T.S. voiced her concern that Anthem's guidelines were in violation of MHPAEA, which required insurers to offer benefits for mental health services "at parity" with comparable medical or surgical benefits. T.S. identified skilled nursing facilities and cognitive rehabilitation services as some of the medical or surgical analogues to the mental health treatment J.S. received.

33. T.S. quoted the Plan's definition of medical necessity and argued that the treatment J.S. received at Solstice was rendered in accordance with this definition. She asked that J.S.'s treatment be evaluated according to the Plan's definition of medical necessity rather than Anthem's proprietary mental health criteria, which she alleged contained inappropriate requirements and, in any event, were superseded by the actual terms of her insurance policy.

34. She requested the reviewer to instruct Anthem to provide her with a copy of all documents and administrative service agreements that pertained to her case, the Plan's mental health and substance use disorder criteria, including Anthem's skilled nursing, cognitive rehabilitation, and hospice criteria, and any reports from any physicians or other professionals regarding the claim. She also requested the identities, qualifications, and denial rates of all individuals who reviewed or were consulted about the claim (collectively the "Plan Documents").

35. She also asked the external reviewer to describe their business relationship with Anthem so that she could have confidence that the review was truly conducted by an independent organization.

36. In a letter dated August 28, 2019, the external review agency upheld the denial of payment for J.S.'s treatment. The letter incorrectly referred to T.S.'s appeal as an appeal request from Solstice and gave the following justification for the denial:

> The patient is admitted to residential level of care for chronic depression and anxiety without less restrictive levels of care having been accessed. She is noted to have received outpatient individual therapy and medication management as well as school supports, with variable success. She is admitted when her mother becomes concerned about a letter her daughter wrote, which expressed depressive symptomology. Suicidal ideation is cited as a reason for this admission, but she denies suicidal ideation in this letter and does not report suicidal ideation on or during admission.[2] There is no indication that the patient has previously received higher level of care than weekly individual therapy and regular medication management appointments. It is clear that family issues are contributing to the patient's presentation but there is no evidence that family therapy has been conducted. She additionally has not attended group therapy, from which she could benefit. Intensive Outpatient or Partial Hospital level of care was not attempted prior to this placement. While she admits to a number of symptoms of depression during her admission, she also acknowledges that she has a number of close friends and interests. Although she misses school due to migraines, she is not noted to be having significant academic difficulty. She has not attempted suicide or self-harm and has not harmed others, destroyed property, run away, used drugs, or gotten into legal trouble. During her admission, she goes on a number of passes with her parents, some overnight, and is not noted to have difficulty. She does not require physical intervention or any significant staff intervention. She is not noted to express or exhibit suicidal or homicidal ideation, hallucinations, delusions or any other abnormal thought processes. She engages in all activities and treatments; she is not noted to require prompting to get out of bed, take care of daily hygiene or participate. She does not engage in any dangerous, threatening or significantly inappropriate behavior. There is no indication that she requires the intensity of around the clock supervision and treatment which is provided in a residential placement.

---

[2] J.S.'s admission intake report (included with the external review request) directly contradicts this statement. The report does specifically reference "SI" or suicidal ideation as one of the mental health conditions J.S. was suffering from.

37. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

38. The denial of benefits for J.S.'s treatment was a breach of contract and caused T.S. to incur medical expenses that should have been paid by the Plan in an amount totaling over $240,000.

39. Anthem failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of T.S.'s request.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

40. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

41. Anthem and the Plan failed to provide coverage for J.S.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

42. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

43. The denial letters produced by Anthem do little to elucidate whether Anthem conducted a

meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Anthem failed to substantively respond to the issues presented in T.S.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

44. Anthem and the agents of the Plan breached their fiduciary duties to J.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in J.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of J.S.'s claims.

45. The actions of Anthem and the Plan in failing to provide coverage for J.S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

46. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

47. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

48. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also

makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

49. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

50. The medical necessity criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

51. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for J.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

52. For none of these types of treatment does Anthem exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

53. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

54. Anthem and the Plan evaluated J.S.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

55. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Anthem's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that J.S. received. Anthem's improper use of acute inpatient medical necessity criteria is revealed in the statements in Anthem's denial letters such as "You were not at risk for serious harm that you needed 24 hour care."

56. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that J.S. received.

57. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

58. The absence of acute level symptoms was also one of the primary justifications utilized by the external reviewer to deny payment. The reviewer observed, "She has not attempted suicide or self-harm and has not harmed others" and also that, "She is not

noted to express or exhibit suicidal or homicidal ideation, hallucinations, delusions or any other abnormal thought processes."

59. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

60. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

61. Another example of the way in which the Defendants violated MHPAEA was in basing their denial of coverage for the treatment provided at Solstice on the absence of J.S. obtaining treatment at the intensive outpatient and partial hospitalization program level of care before being treated at Solstice. These "fail-first" requirements are specifically referenced in the Final Rules of MHPAEA as constituting an impermissible nonquantitative treatment limitation.

62. The external reviewer repeatedly references the lack of prior treatment at lower levels of care and it appears that this heavily influenced the decision to deny care. For instance, the reviewer writes, "Intensive Outpatient or Partial Hospital level of care was not attempted prior to this placement." The reviewer does acknowledge that J.S. received individual therapy but appears to dismiss the failure of other treatment interventions in J.S.'s

history, due to an absence of recorded interventions at other level of care such as partial hospitalization facilities.

63. Anthem does not deny payment at analogous medical or surgical facilities such as skilled nursing care simply because a lower level of care was not initially attempted. Notably, J.S. did receive multiple interventions at a lower level of care, however these were apparently not intensive enough to satisfy the external reviewer.

64. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

65. Anthem and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Anthem and the Plan were not in compliance with MHPAEA.

66. The violations of MHPAEA by Anthem and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

 (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

 (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

 (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

 (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

 (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

 (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

67. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for J.S.'s medically necessary treatment at Solstice under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 24th day of March, 2022.

By     s/ Brian S. King
        Brian S. King
        Attorney for Plaintiffs

County of Plaintiffs' Residence:
Haywood County, North Carolina.